THE KEWANEE BOILER COMPANY

*v.*

ANDREW G. ERICKSON.

*Opinion filed October 19, 1899.*

1. MASTER AND SERVANT—*servant may rely on master's statements as to safety of place to work.* An employee directed to enter a boiler to make repairs at a specified time has a right to rely on the employer's statement that everything would then be ready, and to presume the conditions were safe, unless something occurred to put him on inquiry to the contrary.

2. SAME—*master should impart his knowledge of danger to the servant.* The failure of a master, upon learning of the fact, to give notice to a servant whom he had directed to enter one of a series of connected boilers at a certain time for the purpose of making repairs under assurance of safety, that there was steam in the other boilers, is such negligence as authorizes a recovery by the servant for injuries sustained thereby.

*Kewanee Boiler Co.* v. *Erickson,* 78 Ill. App. 35, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Henry county; the Hon. W. H. GEST, Judge, presiding.

This was an action on the case brought by appellee, against appellant, to recover damages for personal injuries sustained by him while in the employ of appellant as a boiler-maker.

Appellant was a corporation engaged in the business of making and repairing steam boilers at Kewanee, and the accident which caused appellee's injury happened in consequence of steam coming into the No. 4 boiler of the Western Tube Company (another corporation) through the blow-off pipe or "mid-leg." The Western Tube Company had in operation at its plant in Kewanee a battery of four large steam boilers for the generation of steam to supply the motive power for its said plant. These were large boilers set horizontally in brick masonry, side by side and close to each other, with upright brick walls

between them, the four boilers and masonry forming one compact structure. At the rear of this battery of boilers was a main blow-off pipe extending the whole length of the battery, and connected therewith were separate blow-off pipes to each boiler, with valves and cocks so arranged that each boiler might be used separately or' in connection with its fellows, and the steam shut out of any one boiler while being used in the others, as the necessities or convenience of the business might require. The boilers were numbered consecutively, 1, 2, 3 and 4, No. 4 being the most southerly of the lot. When the entire battery of boilers was in action the valves in the blow-off pipes (or "mid-legs," as they were sometimes called by the witnesses,) are all left shut, but whenever, for the purpose of cleaning, washing out or repairing any one of the boilers, it was desired to separate it from the others in the battery, leaving them in action, it could be done by closing a valve leading from the generator or heater above into the dome, which would cut off the live steam and prevent it from entering the boiler, thus entirely isolating the boiler thus cut off; but if the valve in one of the mid-legs of the "live" boilers were opened and at the same time the valve in the mid-leg of the isolated boiler were left open, then, if the pressure were sufficient, there would be a rush of steam from the live boilers through the common or general blow-off pipe of the battery into such isolated boiler. Perhaps this is a sufficient statement as to the situation of the boilers, and their connection, to a fair understanding of the manner in which appellee's injury occurred.

It having been discovered that boiler No. 4 of the battery described required to be repaired by a patch in the bottom of the shell, Norval D. Bailey, the tube company's superintendent in charge of the plant, applied to appellant to make such repairs. An arrangement was made with the witness Horton Vail, appellant's vice-president and superintendent, to make such repairs, and it was

agreed that the tube company should have the boiler in question (No. 4) blown off and cooled down by four o'clock of Saturday afternoon, March 14, 1896, so that appellant's men could go to work thereon at that time, but the hour was subsequently changed to nine o'clock of the same evening, when it was arranged that appellant should send its men to remove the tubes or flues from the boiler, which was necessary to be done before the repairs could be made. It was not necessary that men should enter the boiler to remove the flues. It was further arranged that on Sunday morning appellant should send other men to patch the boiler and re-set the flues. The tube company was also to send men to "scale" the boilers,— that is, to remove with hammers the lime or "scale" accumulated on the interior thereof by the evaporation of water used therein. This work required that the men engaged in it should enter and work in the boiler. In arranging for the repair of the boiler, Vail told Bailey that he would not allow appellant's men in the boiler with steam on in any of the other boilers, and Bailey said that would be all right and that steam would be shut off Sunday morning. With this understanding Vail directed appellee and other of the boiler-makers to go to this boiler No. 4 on Sunday morning to assist in making the repairs, at the same time telling appellee that everything would be ready by that time. In accordance with this direction, appellee and two other servants of appellant, viz., Lindberg and Larson, went to this boiler on Sunday morning, entered it and commenced work on the repairs. The boiler was cold and there does not appear to have been any indication of danger to the men while there employed or anything to cause them to make inquiry in that regard, but while they were thus engaged in their work, and without any warning whatever, a sudden rush of steam and hot water came into the boiler, and before appellee could make his exit therefrom he was so badly scalded as to be seriously and permanently injured.

The negligence charged in the declaration was, that appellant failed to use reasonable care to provide a safe place for appellee in which to do the work required of him.   The defense relied upon was that appellee knew of the danger, or by the use of ordinary care might have known of the danger and avoided it.

The cause was tried by a jury, resulting in appellee's favor for $2500, upon which the court entered judgment after overruling motion for a new trial, and the defendant appealed to the Appellate Court, where the judgment was affirmed.

HENRY CURTIS, AMERICUS B. MELVILLE, and BLISH & LAWSON, for appellant.

N. F. ANDERSON, (C. C. WILSON, of counsel,) for appellee.

Per CURIAM: In deciding this case the Appellate Court delivered the following opinion:

"The law is well settled that it is the duty of the master to use reasonable care to furnish his servants a reasonably safe place in which to perform his work.   That is a positive obligation resting upon the master, and he is liable for the negligent performance of that duty, whether he undertakes its performance personally or through another servant. (*Chicago and Alton Railroad Co. v. Scanlan,* 170 Ill. 106.) It is also the law, that if the servant knew of the danger, if any exist, or by the exercise of reasonable care might know of and avoid it, but voluntarily assumes the risk, he cannot recover for any injury sustained, even though the master may have been negligent in his duty to the servant.

"This is too familiar a proposition to need any citations of authorities in its support, but we fail to see that it has any application in the case at bar.   There is no proof that appellee knew there was any steam in the boilers adjoining that in which he was working, and no

reason appears why he should have looked for or examined to see if there was danger. The boiler he entered was cold, and other men were working in it when he arrived there. He had a right to rely on the assurance of Vail that everything would be ready for him at seven o'clock Sunday morning,—the time he was directed to go to work. According to the testimony of Vail, Bailey had promised to have the steam down in all the boilers at that time, and had refused to let his men enter into No. 4 until the steam was out of the whole battery, no doubt because he knew it would be dangerous for them to do so. From the testimony of Bailey it appears that he informed Vail on Saturday afternoon that steam would be required for the annealing furnace some time on Sunday morning, the precise time, however, not being stated. At any rate, Vail was on the ground on Sunday morning for some fifteen minutes before the injury to appellee, and discovered that there was steam in the boilers. He talked with Stanton, the fireman or engineer, about it, and gave no notice to appellee, although he must have known it was dangerous, because he had declared his men should not enter the boiler to make repairs until the steam was out of all the boilers. We think such negligence was such as authorized a recovery. Vail had no right to tell appellee everything would be ready for him unless such were the fact and all reasonable precautions had been taken to secure his safety. Appellee had a right to rely on this statement of Vail and to presume the conditions were safe, unless something occurred to put him on inquiry as to the contrary, and nothing of the kind appears in the evidence. On the other hand, even though Vail may have supposed, when he gave the directions to appellee to go to work as stated, that all proper precautions had been taken, still, when he discovered that steam was in the boilers and that thereby appellee was in danger, it was his duty to have given notice to appellee that he might avoid the danger. Not to do

so was such negligence as rendered appellant liable for the injury.

"We find no material error in the rulings of the court upon the evidence, nor in the giving, refusing or modifying instructions. The instructions asked by appellant and refused by the court ignored the duty of appellant to give notice of the danger when discovered by Vail. On the whole, we think the jury were fairly instructed as to the law of the case, and we see no sufficient reason for reversing the judgment. It will therefore be affirmed."

Concurring in the views expressed by the Appellate Court, and in the conclusion reached by it, we adopt the foregoing opinion as the opinion of this court. Accordingly, the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*